# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TYREEM M. RIVERS, | Civil No. 3:16-cv-2092 |
| Plaintiff | (Judge Mariani) |
| v. | |
| SUPERINTENDENT LAWRENCE MAHALLY, *et al.*, | |
| Defendants | |

## MEMORANDUM

Plaintiff Tyreem Rivers ("Rivers"), an inmate currently confined at the State Correctional Institution, Dallas, Pennsylvania ("SCI-Dallas"), initiated this action pursuant to 42 U.S.C. § 1983. (Doc. 1). Named as Defendants are Superintendent Lawrence Mahally, Deputy Superintendent Joseph Zakaraukas, Safety Manager Eric Sowga, Shift Commander Stanley Pohlidal, and Correctional Officer Jose Correa. (*Id.* at pp. 1-2). Presently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 64). For the reasons set forth below, the Court will grant the motion.

I.  **Allegations of the Complaint**

On October 16, 2014, between 1:00 a.m. and 2:00 a.m., there was a fire at SCI-Dallas. (Doc. 1, p. 2). Rivers alleges that he awoke to the sound of a firm alarm and flashing lights. (*Id.* at p. 3). A block officer removed Rivers from his cell and placed him in

the dayroom with approximately two hundred (200) other inmates until the fire was under control. (*Id.*). Rivers claims this action violated the prison's fire evacuation plan and safety policy posted in the housing unit. (*Id.*). Rivers claims that he inhaled "toxic smoke and fumes" as a result of the block officer's actions. (*Id.*). As a result of the smoke inhalation, Rivers, an asthmatic, alleges that he suffered from pain, dizziness, migraines, difficulty breathing, and irritation of the throat, eyes, nose, and chest. (*Id.*). He states that he was treated by the medical department and received several medications to treat his alleged injuries. (*Id.*).

Rivers alleges that Defendant Zakaraukas arrived at the scene and was "negligent/liable in failing to follow a proper evacuation plan and/or for ordering that this Plaintiff . . . be locked in the day room[] while the fire took place and sought to be placed under control." (*Id.*). He alleges that Defendant Sowga "failed to insure that the B-Block Housing Unit was expected, safe, and free from a unreasonable fire incident, and/or liable/negligent for not enforcing a proper plan which would have prevented this Plaintiff from being injured etc." (*Id.*) (sic). He further alleges that Defendant Mahally was "negligent and/or liable in this matter due to his failure to 'enforce' a proper fire evacuation plan in consideration of the general safety and welfare of this Plaintiff here at SCI Dallas," and "due to 'his failure' to properly train each of the above stated Defendants in following the proper fire evacuation plan." (*Id.* at p. 4).

On October 21, 2014, Rivers filed a grievance pertaining to the fire on October 16, 2014, designated as Grievance Number 533613. (*Id.* at p. 7). On November 6, 2014, Safety Manager Sowga denied the grievance on initial review. (*Id.* at p. 13). Rivers filed an appeal to the Facility Manager. (*Id.* at p. 14). On November 28, 2014, Facility Manager Mahally upheld the response of Safety Manager Sowga. (*Id.* at p. 14). Rivers then filed an appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (*Id.* at p. 16). On January 27, 2015, the Chief Grievance Officer upheld the decisions of Safety Manager Sowga and Facility Manager Mahally. (*Id.* at p. 17).

In the complaint, Rivers alleges that Defendants acted negligently and thereby violated his Eighth Amendment rights. (Doc. 1). Rivers seeks declaratory relief, compensatory and punitive damages, and costs. (*Id.* at pp. 8-9).

## II. Statement of Undisputed Facts

DC-ADM 15.1.1 Section 2D states that "[t]he facility will have a written fire plan that plans for protection of all persons in the event of a fire and/or an evacuation to an area of refuge. Facility fire plans will include, but are not limited to, the following: a. internal and external fire notification procedures; b. fire evacuation procedures; c. key control/remote-unlocking procedures; Fire Emergency Response Team (FERT) deployment procedures; e. detailed floor plans identifying primary and secondary routes of egress in relation to location; and f. available types of fire detection, notification and suppressions systems." (Doc. 66, Statement of Material Facts, ¶ 8; Doc. 77, Counterstatement of Material Facts, ¶

8). Defendants contend that DC-ADM 15.1.1, Section 2D does not require full, outdoor evacuation in the event of every fire or emergency. (Doc. 66 ¶ 9). Rivers asserts that DC-ADM 15.1.1 does not specifically state that an outdoor evacuation is not required in the event of a fire. (Doc. 77 ¶ 9).

Every individual housing unit at SCI-Dallas including B-Block, has an Emergency Evacuation Plan visually posted that instructs all staff and inmates to exit through primary and secondary emergency exits that lead to outdoor safety in the event of an actual fire. (Doc. 66 ¶ 10; Doc. 77 ¶ 10). The parties dispute when a full evacuation outdoors is required. (Doc. 66 ¶ 10; Doc. 77 ¶¶ 10-16, 35-36).

Defendants assert that every staff member employed at SCI-Dallas properly receives emergency training to handle themselves and the lives of inmates in all potential emergency situations, including fires. (Doc. 66 ¶ 11).

Defendants contend that routine fire drills are conducted once per quarter in accordance with policy and all drills are reported on the standard Fire Drill Report Form. (Doc. 66 ¶¶ 12, 13). Defendants further contend that drills include evacuation of all staff and inmates, except when there is clear and convincing evidence that security may be jeopardized. (*Id.* at ¶ 14). When security is in question, actual evacuation during drills is not required. (*Id.*).

Defendants aver that the Department of Corrections ("DOC") operates under a "defend in place" policy, and evacuation does not always mean moving the inmates outdoors. (Doc. 66 ¶¶ 15, 16).

Fire drills are not held in the middle of the night. (Doc. 66 ¶ 17; Doc. 77 ¶ 17). For safety and security reasons, the fire drill procedures are only reviewed with staff on the overnight, 10:00 p.m. to 6:00 a.m. shift. (Doc. 66 ¶ 18).

On October 16, 2014, Rivers was housed at SCI-Dallas on the B-Block Housing Unit in cell 72, top tier. (Doc. 66 ¶ 19; Doc. 77 ¶ 19). At that time, B-Block held approximately two hundred (200) inmates. (*Id.* at ¶ 20).

On October 15, 2014 at approximately 10:25 p.m., SCI-Dallas experienced a power outage affecting half of the institution, and the facility was operating at half-power. (Doc. 66 ¶ 21; Doc. 77 ¶ 21). Maintenance staff and Defendant Deputy Zakarauskas were notified of the situation. (Doc. 77 ¶ 21).

On October 16, 2014 at approximately 1:15 a.m., Facility Maintenance Manager Mooney reported that a transformer was on fire under B-A Block and the Fire Emergency Response Team was activated. (Doc. 66 ¶ 22; Doc. 77 ¶ 22). On October 16, 2014 at approximately 1:16 a.m., the Emergency Plan was activated as per Captain Stanley Pohlidal. (*Id.* at ¶ 23). On October 16, 2014 at approximately 1:18 a.m., inmates were evacuated from the immediate area of concern to the dayroom. (*Id.* at ¶ 24).

On October 16, 2014 at approximately 1:20 a.m., the Fire Emergency Response Team entered the area of the fire. (Doc. 66 ¶ 25; Doc. 77 ¶¶ 24, 25).

On October 16, 2014 at approximately 1:45 a.m., exhaust fans were placed on B-A Block. (Doc. 66 ¶ 27; Doc. 77 ¶ 27).

On October 16, 2014 at approximately 1:50 a.m., Superintendent Lawrence Mahally was notified of the incident. (*Id.* at ¶ 28).

On October 16, 2014 at approximately 2:00 a.m., the fire was reported extinguished by utilizing fire extinguishers. (Doc. 66 ¶ 26; Doc. 77 ¶ 26).

On October 16, 2014 at approximately 2:20 a.m., inmates affected by the smoke were escorted to the infirmary for medical assessment. (*Id.* at ¶ 29).

After the smoke cleared from the housing unit, inmates were escorted from the dayroom back to their cells. (*Id.* at ¶ 30).

On October 16, 2014 at approximately 2:59 a.m., Kim Lux, RN reported to B-A Block to address any medical issues with inmates. (*Id.* at ¶ 31).

On October 16, 2014 at approximately 3:02 a.m., a notification was made that the institution was operating under a limited state of emergency. (*Id.* at ¶ 32).

On October 16, 2014 at approximately 3:15 a.m., water containers with drinking water were delivered to A-A, A-B, and B-A Blocks to be distributed to inmates. (*Id.* at ¶ 33).

On October 16, 2014 at approximately 3:15 p.m., SCI-Dallas was returned to normal operations. (*Id.* at ¶ 34).

Defendants contend that with respect to the October 16, 2014 incident, a full evacuation was not required because it was a small fire in an unoccupied electrical vault in the basement of the housing unit. (Doc. 66 ¶ 35). Defendants state that the fire plan was followed and did not require full evacuation outside due to security reasons, and that the safety and security of the inmates was a priority at all times during the response to this fire. (Doc. 66 ¶¶ 36, 37).

On October 17, 2014 at approximately 2:15 a.m., Rivers reported to medical with complaints of nausea and vomiting as a result of recent smoke inhalation. (Doc. 66 ¶ 38; Doc. 77 ¶ 38). Rivers was evaluated, treated, and released by Kim Lux, RN. (*Id.*). Rivers was again treated on October 17, 2014 for a lung assessment and was prescribed medication. (*Id.* at ¶ 39). Rivers suffers from chronic asthma and uses an albuterol inhaler when he has trouble breathing. (*Id.* at ¶¶ 40, 41). He carries the albuterol inhaler with him. (*Id.* at ¶ 42). He usually gets sick two times per year when the weather changes. (*Id.* at ¶ 41). After the fire, Rivers had to use his albuterol inhaler more frequently, approximately two (2) puffs, twice a day. (*Id.* at ¶ 43).

On October 20, 2014, Rivers received follow-up care regarding smoke inhalation. (Doc. 66 ¶ 44; Doc. 77 ¶ 44). It was noted that his condition improved, but he reported having lingering headaches. (*Id.*). Rivers was prescribed Tylenol for twelve (12) days for headaches and Q-Tussin cough syrup for six (6) days for chest congestion. (*Id.* at ¶ 45).

On October 21, 2014, Rivers filed a grievance with Facility Grievance Coordinator Robin Lucas seeking no less than ten (10) million dollars for physical and mental suffering as a result of the October 16, 2014 fire incident. (*Id.* at ¶ 46). The grievance was assigned number 533613. (*Id.* at ¶ 47). Grievance number 533613 claimed that all staff members failed to follow the proper fire evacuation rules causing Rivers to be subjected to smoke inhalation. (*Id.* at ¶ 48).

On November 6, 2014, Defendant Sowga denied Grievance number 533613, stating that the DOC operates on a "defend in place" strategy, but that evacuation of inmates from their cells was determined to be the best action and, therefore, inmates in the affected area were placed in the dayroom. (*Id.* at ¶ 49). The response to Grievance number 533613 states that "[a]t no time were you or your wellbeing put into a dangerous situation by being put into the dayroom" and if "the situation had gotten worse the entire block would have been evacuated." (*Id.* at ¶ 50). The response to Grievance number 33613 also states that "[o]n 10-30-14 [Defendant Sowga] went to medical to ensure you received the proper medical care, which you did." (*Id.* at ¶ 51).

On November 7, 2014, Rivers filed an appeal to the Facility Manager. (*Id.* at ¶ 52). On November 18, 2014, Defendant Mahally denied the appeal, noting that the initial response contained detailed information regarding the matter. (*Id.* at ¶ 53).

On November 28, 2014, Rivers filed an appeal to the Secretary's Office of Inmate Grievances and Appeals. (*Id.* at ¶ 54). On January 27, 2015, the Chief Grievance Officer

for DOC denied Rivers' final appeal, stating that a complete evaluation was done regarding the incident and that "placing inmates into the dayroom was substantial. Had the situation worsened, the inmates would have been evacuated to another location." (*Id.* at ¶ 55). The response further stated there was "no evidence provided that housing rules were violated. The Inmate Handbook addresses the procedure to be followed during a fire drill. This was an actual event that staff handled appropriately." (*Id.* at ¶ 56).

III. **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the

9

assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. Discussion

### A. Eighth Amendment Claim

A prison official violates the Eighth Amendment when: (1) the prisoner suffers an objectively, sufficiently serious deprivation; and (2) the prison official acts with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) (stating, "an inmate [is required] to show that 'he is incarcerated under conditions posing a substantial risk of serious harm,' and that prison officials demonstrated a 'deliberate indifference' to his health or safety"). Under the first element, a "prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834. To establish deliberate indifference under the second element, the prison official must: (1) know of and disregard an excessive risk to inmate health or safety; (2) be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists; and (3) draw the inference. *Id.* at 837. Negligence is not the same as wanton or deliberate indifference, and will not support a § 1983 claim. *Id.* at 835.

Rivers asserts that Defendants were deliberately indifferent to his safety because an outdoor evacuation did not occur during the fire at SCI-Dallas on October 16, 2014. DC-ADM 15.1.1 Section 2D, Facility Fire Plans, states as follows:

> The facility will have a written fire plan that plans for protection of all persons in the event of a fire and/or an evacuation to an area of refuge. Facility fire plans will include, but are not limited to, the following:

11

      a. internal and external fire notification procedures;

      b. fire evacuation procedures;

      c. key control/remote-unlocking procedures;

      d. Fire Emergency Response Team (FERT) deployment procedures;

      e. detailed floor plans identifying primary and secondary routes of egress in relation to location; and

      f. available types of fire detection, notification and suppressions systems.

(DC-ADM 15.1.1 Section 2D). There is no language in DC-ADM 15.1.1, Section 2D that requires a full, outdoor evacuation in the event of every fire.

The SCI-Dallas facility Emergency Evacuation Plan states as follows:

> When an alarm sounds or notice is given, ALL persons will evacuate the building in an orderly manner. Evacuation shall be through the "Primary Exit" unless otherwise instructed to use the "Secondary Exit". All persons shall assemble at least 50 feet from the building.

(Doc. 76, p. 2). This plan is visually posted on the housing blocks. Although this plan instructs all persons to exit through primary and secondary exits that lead to outdoor safety in the event of a fire, Defendants have submitted evidence that evacuation does not always mean moving the inmates outdoors and that the DOC uses a "defend in place" strategy. (Doc. 66-3, p. 10). Defendant Safety Manager Sowga indicated that the "defend in place" policy is followed when a full evacuation is not required. (*Id.*). However, in this instance, evacuation of the inmates from their cells was determined to be the best course of action.

12

The undisputed evidence establishes that prison officials made the decision to keep the inmates indoors due to the time of day, the location of the fire away from any real threat to the inmates, and the small size of the fire. (Doc. 66 ¶¶ 35, 36, 49, 50). Defendants did not believe the inmates were in danger in the dayroom, and they were immediately evacuated from the area of the fire to a safe, secure area. (*Id.* at ¶¶ 37, 50, 56). This alternate strategy of evacuating inmates to an indoor, secure area is reasonable when circumstances make evacuation outdoors impractical.

The record reflects that prison officials provided a swift response to the incident on October 16 and 17, 2014. The Fire Response Team responded to the fire immediately and began extinguishing the fire. (Doc. 66-5, p. 12; Doc. 76, p. 23). The fire was contained in a small area in an electrical vault underneath B-Block, away from inmates. (Doc. 66-5, p. 39). Because there was smoke on B-Block, the inmates were evacuated from their cells to the dayroom. (Doc. 66-5, p. 12; Doc. 76, p. 23). This evacuation occurred within three (3) minutes of the fire. (*Id.*). Once the inmates were in the dayroom, exhaust fans were placed on the block and inmates were immediately escorted to the medical department. (Doc. 66-5, pp. 12-13; Doc. 76, pp. 23-24). After the fire was extinguished and the smoke was cleared from the housing unit, the inmates were placed back in their cells, and water was provided to them. (Doc. 66-5, pp. 13, 21; Doc. 76, p. 24).

The record reflects that Rivers was treated by medical twice on October 17, 2014. (Doc. 66-5, pp. 128-31). He was first treated at approximately 2:15 a.m. for complaints of

13

nausea and vomiting. (*Id.*). Later that day, medical performed a lung assessment, prescribed medication, and Rivers continued to use his albuterol inhaler. (*Id.*). On October 20, 2014, Rivers received follow-up medical care. (*Id.*). At this visit, it was noted that his condition improved, but he suffered from headaches and a cough. (*Id.*). Therefore, Rivers was prescribed Tylenol and cough syrup. (*Id.*).

Based on the foregoing, the Court finds that Defendants did not act with deliberate indifference when responding to the fire. Under the circumstances, Defendants took the most secure path to move the inmates to safety without evacuating them outside. A party opposing summary judgment must come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. *See Anderson*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986); *see also* FED. R. CIV. P. 56(c), (e). Rivers has failed to meet his burden with respect to his deliberate indifference claim and summary judgment will be entered in favor of Defendants on this claim.

### B. Claims of Alleged Violation of Prison Policy

Rivers asserts liability based on Defendants' violation of prison policies, procedures and rules. Specifically, Rivers asserts that Defendants violated prison policy by failing to fully evacuate the inmates outside pursuant to the "proper fire evacuation plan." (Doc. 1, p.

14

3). However, a violation of an internal prison policy does not automatically rise to the level of a constitutional violation. "[A] prison policy manual does not have the force of law and does not rise to the level of a constitutional violation." *Atwell v. Lavan*, 557 F.Supp.2d 532, 556, n. 24 (M.D. Pa. 2008) (citing *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 154 (3d Cir. 2004)). The Third Circuit has clearly stated that "agency interpretive guidelines 'do not rise to the level of a regulation and do not have the effect of law.'" *Mercy Catholic Med. Ctr.*, 380 F.3d at 155 (citation omitted). Consequently, Defendants cannot be liable simply for violating a prison policy and their motion will be granted as to this claim. *See Estrella v. Hogsten*, 2007 WL 2065879 (M.D. Pa. July 16, 2007) (holding that mere failure of prison officials to follow their own regulations alone is not a constitutional violation).

### C.    Negligence Claim

Rivers also asserts that Defendants were negligent in placing inmates in the dayroom instead of evacuating them outside. Defendants contend that they are immune from liability with respect to this state law claim of negligence. (Doc. 65, pp. 16-17). State prison officials are immune from suit for those actions within the scope of their duties, except in instances in which the immunity has been specifically waived. *See* 1 PA. CONS. STAT. ANN. § 2310. Rivers' claims do not fall under any one of the nine listed categories for

which immunity has been waived by the Commonwealth of Pennsylvania.[1] *See* 42 PA. CONS. STAT. ANN. § 8522(b). As such, Defendants are entitled to immunity on the state law negligence claim and the Court will enter judgment in favor of Defendants on the negligence claim.

### D. Official Capacity Claims

Defendants argue that any claims seeking monetary damages against them in their official capacities are barred by the Eleventh Amendment. (Doc. 65, pp. 22-23). Personal capacity suits under section 1983 seek to recover money from a government official, as an individual, for acts performed under color of state law. Official capacity suits, in contrast, generally represent an action against an entity of which the government official is an agent. *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978). When suits are brought against state officials in their official capacities, those lawsuits are treated as suits against the state. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). However, the doctrine of sovereign immunity, established by the Eleventh Amendment, protects states, such as the Commonwealth of Pennsylvania, from suits by citizens. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100-01, 117 (1984); *Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252, 265

---

[1] The nine categories for which sovereign immunity will not apply are: (1) vehicles in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) the care, custody, or control of personal property; (4) a dangerous condition of Commonwealth agency real estate and sidewalks; (5) dangerous conditions of highways created by potholes or sinkholes; (6) the care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. *See* 42 PA. CONS. STAT. ANN. § 8522(b).

(1996); *Lavia v. Pennsylvania*, 224 F.3d 190, 195-96 (3d Cir. 2000). That immunity runs to state officials if they are sued in their official capacity and the state is the real party upon which liability is to be imposed. *Scheuer v. Rhodes*, 416 U.S. 232, 237-38 (1974). Congress has not abrogated the immunity regarding Rivers' claims, nor has Pennsylvania waived this grant of immunity. *See* 42 PA. STAT. ANN. AND CONS. STAT. ANN. § 8521(b). Hence, Rivers' claims for money damages against the Defendants in their official capacities are barred by sovereign immunity. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010).

### E. Qualified Immunity

Even if Rivers had stated a colorable constitutional claim, Defendants are nevertheless entitled to qualified immunity from this claim for damages. In order to establish a civil rights claim, Rivers must show the deprivation of a right secured by the United States Constitution or the laws of the United States. However, government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity

17

balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing *Pearson*, 555 U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571 F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first). As stated, the Court finds that Rivers failed to establish the violation of a constitutional right. Defendants simply could not have recognized that their action of evacuating inmates to a secure, indoor location would violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would

have known." *Wilson*, 526 U.S. at 609. Therefore, Defendants are protected from liability by qualified immunity.

## V. <u>Conclusion</u>

Based on the foregoing, the Court will grant Defendants' motion (Doc. 64) and enter summary judgment in their favor. A separate Order shall issue.

Dated: February 18, 2020

Robert D. Mariani
United States District Judge